State *v.* Michael R.

## STATE OF CONNECTICUT *v.* MICHAEL R.*
### (SC 20523)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker and Alexander, Js.

*Syllabus*

Convicted, after a jury trial, of sexual assault in the first degree, risk of
injury to a child, employing a minor in an obscene performance, assault
in the third degree, criminal violation of a protective order, and stalking
in the first degree in three cases that were consolidated for trial, the
defendant appealed to this court. The defendant had been romantically
involved with R, and his conviction arose from his alleged abuse of R's
daughter, G. On numerous occasions, the defendant sexually assaulted
G during her weekly sleepovers at the defendant's house. He also gave
G a cell phone and implemented certain rules, including one requiring
G to send him daily "selfies" and one prohibiting G from letting R see
the phone. At the end of one of G's visits to the defendant's house, the
police responded to a complaint that the defendant had refused to return
G to R. After a subsequent visit, R reported to the police that G had
returned from the defendant's house with a bruise on her buttocks, and
G told her pediatrician that she had been struck with a belt numerous
times. Concerned about certain content that R had found on G's cell
phone, R gave it to the police. An extraction of the phone's data revealed
various suggestive photographs and text messages between the defen-
dant and G, including photographs of the defendant lying shirtless in
bed with G, text messages from the defendant instructing G to send
him photographs of G fully and partially nude in various poses, along with
the resulting photographs, and text messages in which the defendant
discussed his plans for punishing G for failing to send him daily selfies.
Thereafter, the trial court issued a protective order prohibiting the defen-
dant from, among other things, following or stalking G. On a subsequent
morning, however, the defendant positioned himself on a bench near
G's school and made eye contact with her as she passed by in her school

---

* In accordance with our policy of protecting the privacy interests of
victims of sexual abuse and the crime of risk of injury to a child, we decline
to use the defendant's full name or to identify the victim or others through
whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3)
(2018), as amended by the Violence Against Women Act Reauthorization
Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to
identify any person protected or sought to be protected under a protection
order, protective order, or a restraining order that was issued or applied
for, or others through whom that person's identity may be ascertained.

346 Conn. 432　　　　　APRIL, 2023　　　　　433

State *v.* Michael R.

van. About two weeks later, the defendant parked his car along the route of G's school van and followed it to G's school after watching it pass by. The defendant represented himself at trial. The trial court denied the defendant's pretrial motion to sever and granted the state's motion for joinder, and the sexual offenses, namely, sexual assault in the first degree, one count of risk of injury to a child based on sexual conduct, and employing a minor in an obscene performance, were tried together with the nonsexual charges of assault in the third degree and another count of risk of injury to a child unrelated to sexual conduct, which related to the incident involving the belt, criminal violation of a protective order, and first degree stalking. At trial, the defendant cross-examined G and attempted to elicit testimony regarding prior inconsistent statements that she had made during two forensic interviews. During the first interview, G initially denied any alleged sexual abuse by the defendant, but, during the second interview approximately six months later, G indicated that the defendant had touched her private parts with both his private parts and his hand on more than one occasion. When the defendant attempted to refresh G's recollection with her statements from her first interview, however, the trial court interjected and instructed the defendant to move on. The defendant also attempted to offer video recordings of the interviews as substantive evidence through his expert witness, but the trial court excluded them on the grounds that there was no foundation for their admission and could not be authenticated by the expert. On the defendant's appeal from the judgments of conviction, *held*:

1. The trial court did not abuse its discretion by consolidating the sexual offenses and the nonsexual offenses for trial, as the evidence relating to the sexual offenses was cross admissible to prove the nonsexual offenses:

The evidence relating to the sexual offenses and the nonsexual offenses was relevant in each case, as all of the offenses involved the same victim and tended to prove the state's theory that the defendant's motive for committing all of the offenses was his sexual interest in, and obsession with, G, and specific evidence suggestive of the defendant's motive relating to the sexual offenses included G's testimony recounting the sexual abuse, the defendant's gifting G with a cell phone and prohibiting R from seeing it, his tracking of G via the phone's global positioning system and asking her to send him daily selfies and photographs of her partially or fully nude, and his positioning himself along G's school van route.

Moreover, it could be fairly inferred that the defendant's nonsexual conduct in following G to school and hitting her with a belt was influenced by his criminal conduct of sexually assaulting her, all of that conduct was tied together by the defendant's obsession with and desire to control G, and, on the basis of that evidence, the trial court reasonably concluded that evidence relating to each charged crime would be probative to show

State *v.* Michael R.

a genuine connection between the defendant's sexual and nonsexual conduct, to corroborate crucial prosecution testimony, and to establish the complete story of the defendant's sexual abuse of G by placing it in context.

Although the evidence relating to G's sexual exploitation was more severe than the evidence relating to the nonsexual incidents involving the stalking and the striking of G with a belt, the evidence of the sexual offenses was more probative than prejudicial with respect to the nonsexual offense charges, and vice versa, and the prejudicial effect of joining the various charges for trial was mitigated by the fact that there was only a single victim, with the charges providing context and motive for the defendant's sexual and nonsexual actions as to that victim, and by the trial court's jury instruction, given on multiple occasions, that the evidence relating to each charge must be considered separately.

2. The defendant could not prevail on his unpreserved claims that the statute (§ 53a-196a (a) (1)) prohibiting the employment of a minor in an obscene performance was unconstitutionally vague as applied to him and that, because the photographs of G were not obscene, they were protected by the first amendment to the United States constitution:

a. Section 53a-196a (a) (1) was not unconstitutionally vague as applied to the defendant's conduct, as the elements of the offense of employing a minor in an obscene performance were adequately defined and afforded the defendant fair and adequate notice that his conduct with respect to G, namely, directing her to model in suggestive poses and to take photographs partially and fully nude, was criminal:

Contrary to the defendant's arguments that there was a definitional conflict in the statutory scheme governing obscenity related offenses, the text of § 53a-196a (a) (1) was clear that the defendant was prohibited from employing a minor to promote an exhibition that, among other things, depicted a prohibited sexual act, such as a "nude performance" showing certain body parts, and the photographs in the present case contained a nude performance.

Even if, as the defendant argued, the term "nude performance" was itself vague in the absence of a judicial gloss that restricted its reach only to nudity of a sexual nature, decisions from this court and the Appellate Court provided ample notice that photographs like those recovered from G's cell phone were within the ambit of the statute and made clear that, when the defendant engaged in the conduct at issue, selfies in which a nine year old child, such as G, is directed to pose fully or partially nude constitute a nude performance under the statute.

b. The photographs of G, in which she posed fully or partially nude at the defendant's instruction, did not warrant first amendment protection:

State *v.* Michael R.

It is well established that obscenity is not a category of expression protected by the first amendment, and § 53a-196a (a) (1) prohibits employing a minor in any material or performance that is "obscene as to minors" and, thus, "harmful to minors," which may be established by demonstrating that the material or performance describes or represents a prohibited sexual act that predominantly appeals to the prurient, shameful or morbid interest of minors, is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and taken as a whole, lacks serious literary, artistic, educational, political or scientific value for minors.

Moreover, although nudity by itself is not pornographic, a photograph can be sexually explicit when it contains a lascivious image, this court has adopted a case specific approach for assessing whether a display is lascivious, and, following an independent appellate review of the photographs at issue, this court concluded that, given G's age and G's sexually suggestive poses at the defendant's direction, the photographs of G depicted a degree of sexual activity that was "harmful to minors" and, therefore, obscene.

3. The defendant could not prevail on his claim that the trial court's improper exclusion of the video recordings of the forensic interviews violated his constitutional rights to confrontation and to present a defense, as any claimed error was harmless beyond a reasonable doubt:

Although the trial court was within its discretion to ensure that the defendant's cross-examination of G was not abusive or intimidating, it should not have interjected when the defendant attempted to refresh her recollection, especially when the defendant's questions were neither tangential nor irrelevant and the prosecutor did not object, and, in this instance, the trial court's desire to protect G interfered with the defendant's attempts to exercise his right to represent himself.

Nevertheless, the trial court's potentially incorrect rulings with respect to the admission of the video-recorded interviews were harmless, as the relevant portions of the first interview were cumulative of trial testimony that G had, on three occasions, denied any sexual misconduct by the defendant, if the recording of the first interview had been admitted, it would have established only what the jury already knew from testimony about G's initial denials, the defendant had the opportunity to highlight any inconsistencies between G's testimony and her statements during the first forensic interview when the defendant cross-examined her, and the defendant's line of questioning repeatedly made the jury aware of the existence of the inconsistencies.

Moreover, G's answers during the second interview about the defendant's touching her vagina with his hand did not differ in any material way from her testimony that his "parts" went inside her private parts a "little bit," and the statements in the second interview corroborated G's testi-

State *v.* Michael R.

mony and squarely established the necessary element of "sexual inter-course" in connection with the sexual assault charge by establishing that penetration, however slight, occurred, such that the admission of the recording of the second interview would have been damaging to the defendant's case.

To the extent that there were any inconsistencies between the statements in the second interview and G's testimony regarding the type of penetration that occurred, the exclusion of the second interview also was harmless because the defendant focused his defense on G's credibility rather than on whether the state had proven the element of penetration, and there was substantial evidence corroborating G's testimony, including expert testimony explaining the concept of delayed disclosure, evidence of the defendant's directing G to send him photographs of G posing nude, and the photographs themselves.

4. The evidence was sufficient to support the defendant's conviction of assault in the third degree, two counts of violation of a protective order, and two counts of stalking in the first degree:

a. There was no merit to the defendant's claim that the evidence was insufficient to support his conviction of assault in the third degree on the ground that he lacked the necessary intent to cause G to sustain a physical injury, in view of his and G's testimony that a blanket was placed over G's buttocks so that it would not hurt her when he struck her with the belt:

The jury reasonably could have inferred the defendant's intent to inflict injury from the physical characteristics of the bruise, which was the size of a "tangerine," the number of times the defendant struck G, the defendant's statements in his text messages indicating that he would "punish" G for failing to send him selfies, and his own consciousness of guilt, as reflected in his misstatements and changes in statements he made to an official from the Department of Children and Families regarding the incident.

b. The evidence was sufficient to support the defendant's conviction of two counts of criminal violation of a protective order, insofar as the evidence warranted an inference that, on two separate dates after the trial court issued the protective order, the defendant had the requisite intent to stalk and follow G:

The jury reasonably could have inferred that, on the date of the first incident, the defendant knew that G would be in the van heading to school, watched the van's route specifically to see G, and cleared a spot on a bench that enabled him to wait there until he saw G, and that, on the date of the second incident, having parked in a nearby parking lot on the van's route and having pulled out of the lot once the van passed by, the defendant followed G to school.

346 Conn. 432 APRIL, 2023 437

State *v.* Michael R.

c. The evidence was sufficient to convict the defendant of stalking in the first degree under the statutory provisions ((Rev. to 2017) § 53a-181c (a) (2) and (3)) proscribing, respectively, stalking that violates a court order in effect at the time of the offense and the stalking of a person under sixteen years of age:

The jury reasonably could have inferred a course of conduct from the fact that, on the date of the first stalking incident, the defendant knowingly lay in wait for, monitored, surveilled, or observed G, and the fact that, on the date of the second stalking incident, the defendant knowingly followed, lay in wait for, monitored, surveilled, or observed G, and it was undisputed that a civil protective order, of which the defendant was aware, was in effect at the time of the stalking, and that G was under sixteen years of age when the stalking occurred.

Argued October 18, 2022—officially released April 11, 2023

*Procedural History*

Substitute information, in the first case, charging the defendant with the crimes of sexual assault in the first degree and risk of injury to a child, and substitute information, in the second case, charging the defendant with the crimes of employing a minor in an obscene performance, risk of injury to a child, and assault in the third degree, and substitute information, in the third case, charging the defendant with two counts each of the crimes of criminal violation of a protective order and stalking in the first degree, brought to the Superior Court in the judicial district of Litchfield and tried to the jury before *Danaher, J.*; verdicts and judgments of guilty, from which the defendant appealed to this court. *Affirmed.*

*Conrad Ost Seifert*, assigned counsel, for the appellant (defendant).

*Laurie N. Feldman*, assistant state's attorney, with whom, on the brief, were *David Shannon*, state's attorney, and *Dawn Gallo*, former state's attorney, for the appellee (state).

State *v.* Michael R.

*Opinion*

ROBINSON, C. J. The principal issue in this appeal requires us to consider when nude images of a minor become "harmful to minors" for purposes of our statute making it a criminal offense to employ a minor in an obscene performance, General Statutes § 53a-196a (a) (1).[1] The defendant, Michael R., appeals[2] from the judgments of conviction, rendered after a jury trial, of one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2);[3] two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (1) and (2);[4] one count of employing a minor in an obscene performance in violation of § 53a-196a (a) (1); one count of assault in the third degree in violation of General Statutes § 53a-61 (a) (1);[5] two counts of

---

[1] General Statutes § 53a-196a (a) provides in relevant part: "A person is guilty of employing a minor in an obscene performance when such person (1) employs any minor, whether or not such minor receives any consideration, for the purpose of promoting any material or performance which is obscene as to minors, notwithstanding that such material or performance is intended for an adult audience . . . ."

[2] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

[3] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ."

[4] General Statutes § 53-21 (a) provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child, or (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of (A) a class C felony for a violation of subdivision (1) . . . and (B) a class B felony for a violation of subdivision (2) . . . ."

[5] General Statutes § 53a-61 (a) provides in relevant part: "A person is guilty of assault in the third degree when: (1) With intent to cause physical injury to another person, he causes such injury to such person or to a third person . . . ."

State *v.* Michael R.

criminal violation of a protective order in violation of General Statutes § 53a-223;[6] and two counts of stalking in the first degree in violation of General Statutes (Rev. to 2017) § 53a-181c (a) (2) and (3).[7] On appeal, the defendant claims that (1) the trial court abused its discretion in consolidating for trial the sexual offenses with the nonsexual offenses, (2) the obscene performance statute is unconstitutionally vague as applied to his conduct, and the first amendment to the United States constitution requires us to undertake an independent appellate review of that conviction, (3) the trial court improperly excluded from evidence exculpatory video recordings of forensic interviews of the victim, G, which violated the defendant's constitutional rights to confrontation and to present a defense, and (4) the evidence was insufficient to support his conviction of assault in the third degree, criminal violation of a protective order, and stalking in the first degree. We disagree with the defendant's claims and, accordingly, affirm the judgments of the trial court.

The record reveals the following background facts and procedural history. Shortly after the defendant became romantically involved with R, a single mother, in 2017, he began taking her then nine year old daughter, G, on outings and movie "dates," buying her toys, gifts, and manicures, and having her sleep over at his house at least once per week. During these visits, the defen-

---

[6] General Statutes § 53a-223 (a) provides: "A person is guilty of criminal violation of a protective order when an order issued pursuant to subsection (e) of section 46b-38c, subsection (f) of section 53a-28, or section 54-1k or 54-82r has been issued against such person, and such person violates such order."

[7] General Statutes (Rev. to 2017) § 53a-181c (a) provides in relevant part: "A person is guilty of stalking in the first degree when such person commits stalking in the second degree as provided in section 53a-181d and . . . (2) such conduct violates a court order in effect at the time of the offense, or (3) the other person is under sixteen years of age."

Hereinafter, unless otherwise indicated, all references to § 53a-181c are to the 2017 revision of the statute.

State *v.* Michael R.

dant and G would sleep together on a pull-out bed, where the defendant sexually assaulted G on numerous occasions. The defendant was not G's legal guardian, but he made her refer to him as "dad" or "daddy."

The defendant gave G a cell phone and implemented certain rules, including one that required G to send him daily "selfies" using the phone's camera. The defendant did not "want [R] in the phone" and instructed G that, if R demanded to see the phone or asked for its passcode, G should tell her, "sorry, it's daddy's phone and daddy's rules. . . . Even if she threatens to beat your ass if you don't. If she punishes you or beats your ass as a result, let me know and I'll call the police." R had experienced financial difficulties both before and during her relationship with the defendant, and, when the electric company shut off her power, the defendant paid to have it reinstated. At one point, however, the defendant threatened to withhold financial support if R did not abide by the rules that he had set for G's use of the cell phone, and he conditioned the continuation of that financial support on his receiving "legal" parental rights to G.

On November 25, 2017, Sergeant Frank Masi of the New Milford Police Department went to the defendant's house after receiving a call that the defendant had refused to return G to R at the conclusion of a visit. Although Masi noted that G appeared hesitant to leave the defendant's home and that everyone appeared to be well cared for, he subsequently contacted the Department of Children and Families (department), suspecting the neglect or abuse of a child. In the following days, the defendant texted G individually to tell her that they would have to "leave each other's lives" because R refused "to do what was right, what [the defendant and G] both wanted, and what was in [G's] best interest: to make [the defendant G's] legal daddy."

State *v.* Michael R.

On November 27, 2017, Masi met with R to discuss her concerns regarding G's stay at the defendant's house on November 25. R reported to Masi that she and one of her coworkers observed that G had returned from the defendant's house with a "black and blue" bruise on her buttocks, about the size of "a tangerine . . . ." G told the pediatrician who examined the bruise that she had been struck with a belt nine times, with a blanket placed over her buttocks. The defendant later admitted to Yvette Newton, a supervisor with the department who investigated the report of suspected abuse and neglect, that, while G was staying with him, he had punished her by striking her buttocks with a belt, but he denied any intent to cause injury.[8]

When she met with Masi, R also expressed concerns about certain content that she had found on G's phone. When she gave Masi the cell phone and its passcode, he again contacted the department. A Cellebrite extraction[9] performed pursuant to a search warrant for the cell phone revealed photographs and text messages between the defendant and G, including two photographs of the defendant laying shirtless in bed with G. The extraction also revealed text messages from the defendant instructing G to send him nude photographs of herself in various poses, along with the accompanying photographs. In some photographs, G holds a stuffed animal (a sloth) that the defendant had given her, partially covering her otherwise nude body. Various text messages were also discovered in which the defen-

---

[8] The defendant initially claimed to Newton that he did not know whether the bruise was from him.

[9] "In short, a Cellebrite [e]xtraction [r]eport lists all call logs, contacts, text messages, and data files on a [cell] phone at the time of the extraction, which is conducted using Cellebrite technology." *Christian* v. *United States*, United States District Court, Docket Nos. 1:16-cr-207 (LMB), 1:19-cv-1058 (LMB), 2020 WL 3244008, *2 (E.D. Va. June 15, 2020), appeal dismissed, 832 Fed. Appx. 238 (4th Cir. 2021).

State *v.* Michael R.

dant discussed with G his plans for punishing her for failing to send him "selfies" by turning off the cell phone.

On December 15, 2017, the trial court issued a civil protective order prohibiting the defendant from, among other things, contacting, assaulting, threatening, abusing, harassing, following, interfering with, or stalking R, G, and G's younger brother.[10] Subsequently, on the mornings of January 3 and 18, 2018, the defendant waited in the parking lots of two nearby businesses and then followed G's school van on her commute to school. In December, 2017, and June, 2018, Danielle Williams, a forensic interviewer at the Center for Youth and Families, interviewed G regarding the allegations of sexual assault against the defendant and his hitting G with a belt, during which G first denied but then later confirmed that the defendant had touched her inappropriately on several occasions and had hit her.

Following his arrest, the state ultimately charged the defendant in three separate informations, which were consolidated for trial over the defendant's objection.[11]

_____

[10] The department subsequently initiated proceedings to remove G and her younger brother from R's care because of the allegations that the defendant had sexually abused G.

[11] The first information charged the defendant with one count of sexual assault in the first degree, alleging that the victim was under thirteen years of age and the actor was more than two years older, in violation of § 53a-70 (a) (2), and one count of risk of injury to a child by contact with the intimate parts of a child under the age of sixteen in a sexual and indecent manner, and likely to impair the health or morals of the child, in violation of § 53-21 (a) (2).

The second information charged the defendant with one count of employing a minor in an obscene performance, in violation of § 53a-196a (a) (1), one count of risk of injury to a child by unlawfully causing a child under the age of sixteen years to be placed in a situation that would likely impair the child's health or morals, in violation of § 53-21 (a) (1), and one count of assault in the third degree with intent to cause physical injury, in violation of § 53a-61 (a) (1).

The third information charged the defendant with two counts of criminal violation of a protective order, in violation of § 53a-223, one count of stalking in the first degree, alleging that the defendant's course of conduct violated a court order in effect at the time of the offense, in violation of § 53a-181c (a) (2), and one count of stalking in the first degree, alleging that the

State *v.* Michael R.

In 2020, the cases were tried to a jury, with the defendant representing himself with standby counsel present. At trial, the prosecutor advanced the theory that the defendant was "obsessed" and "in love with" G. The jury returned verdicts finding the defendant guilty on all counts. The trial court rendered judgments of conviction in accordance with the jury's verdicts and imposed a total effective sentence of thirty years of imprisonment with fifteen years of special parole. This appeal followed. Additional relevant facts will be set forth as necessary in the context of each claim on appeal.

I

Before we address the principal issue concerning § 53a-196a (a) (1), we find it helpful to first consider whether the trial court properly consolidated for trial the sexual offenses with the nonsexual offenses. For purposes of our analysis, the sexual offenses include the charges of sexual assault in the first degree for the alleged sexual abuse of G, risk of injury to a child based on sexual conduct, and employing a minor in an obscene performance. The nonsexual offenses include the charges of assault in the third degree unrelated to sexual conduct and risk of injury to a child unrelated to sexual conduct, for hitting G with a belt, stalking, and violation of a protective order. The defendant claims that the trial court abused its discretion in denying his motion to sever the offenses pursuant to Practice Book § 41-18[12] and in granting the state's motion for joinder pursuant to Practice Book § 41-19[13] because the state failed to

defendant's course of conduct was directed at a specific person under sixteen years of age, in violation of § 53a-181c (a) (3).

[12] Practice Book § 41-18 provides: "If it appears that a defendant is prejudiced by a joinder of offenses, the judicial authority may, upon its own motion or the motion of the defendant, order separate trials of the counts or provide whatever other relief justice may require."

[13] Practice Book § 41-19 provides: "The judicial authority may, upon its own motion or the motion of any party, order that two or more informations, whether against the same defendant or different defendants, be tried together."

State *v.* Michael R.

meet its burden of proving that he would not be substantially prejudiced by the consolidation. The defendant argues that evidence relating to the alleged sexual offenses was not cross admissible to prove the charges of assault, stalking, or violation of a protective order and that he was substantially prejudiced by the joinder under *State* v. *Boscarino*, 204 Conn. 714, 722–24, 529 A.2d 1260 (1987),[14] because of the shocking and brutal nature of the alleged sexual offenses and the complexity of trying the charges together.

The state responds that the trial court properly joined the charges because the evidence of sexual misconduct was cross admissible insofar as it was probative of the defendant's motive, intent, and absence of mistake as to all charges, and also completed the story with regard to the other charges. The state also argues that the *Boscarino* factors are inapplicable because, when evidence is cross admissible, the court's joinder inquiry ends. Guided by our recent decision in *State* v. *James A.*, 345 Conn. 599, 286 A.3d 855 (2022), petition for cert. filed (U.S. March 23, 2023) (No. 22-7080), we agree with the state and conclude that, because the evidence relating to each charged offense was cross admissible, the trial court did not abuse its discretion in denying the defendant's motion to sever and in subsequently granting the state's motion for joinder.

The record reveals the following additional relevant facts and procedural history. In July, 2019, the defen-

_____

[14] In *State* v. *Boscarino*, supra, 204 Conn. 722–24, we "identified several factors that a trial court should consider in deciding whether a severance [or denial of joinder] may be necessary to avoid undue prejudice resulting from [the] consolidation of multiple charges for trial. These factors include: (1) whether the charges involve discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Internal quotation marks omitted.) *State* v. *LaFleur*, 307 Conn. 115, 156, 51 A.3d 1048 (2012).

State *v.* Michael R.

dant filed a motion to sever, arguing that joinder and a single trial of all charges, which appeared in separate files, would be unduly prejudicial.[15] The state opposed the defendant's motion to sever, arguing that the trial court could join the three informations for trial because they alleged discrete, factually distinguishable scenarios, and the evidence that the state intended to offer was cross admissible in each case. The state also reasoned that, because the evidentiary portion of the trial was not anticipated to last longer than four days, the jury could consider the cases separately in light of the short duration and simplicity of the trial. Ultimately, in October, 2019, the trial court denied the defendant's motion to sever, determining that joinder of the three informations for trial would not be unduly prejudicial to the defendant under the *Boscarino* test. The state thereafter filed a motion for joinder, which the trial court granted.

"[The] General Statutes and rules of practice expressly authorize a trial court to order a defendant to be tried jointly on charges arising from separate cases. . . . [I]n *State* v. *LaFleur*, 307 Conn. 115, 159, 51 A.3d 1048 (2012), and *State* v. *Payne*, 303 Conn. 538, 544–50, 34 A.3d 370 (2012) . . . we rejected the notion of a blanket presumption in favor of joinder and clarified that, when charges are brought in separate informations, and the state seeks to join those informations for trial, the state bears the burden of proving that the defendant will

---

[15] The defendant argued that the trial court should grant his motion to sever, citing the following grounds: (1) the "[s]ubstantial number of omissions and misrepresentations of material facts and lies by the New Milford Police Department"; (2) "the only related facts of [the] cases are the individuals involved"; (3) "each case individually represents one, since alleged event, and . . . the state should be confident enough in the strength and merit of each case" to successfully prosecute each one separately, without reference to the others; (4) the "[specious] nature and seriousness of each case separately"; (5) the "[u]nreliable statements of discreditable . . . witnesses"; and (6) the "[c]urrent political and social climate . . . ."

not be substantially prejudiced by joinder pursuant to Practice Book § 41-19. . . . The state may satisfy this burden by proving, by a preponderance of the evidence, either that the evidence in the cases is cross admissible *or* that the defendant will not be unfairly prejudiced pursuant to the factors set forth in *State* v. *Boscarino*, [supra, 204 Conn. 722–24] . . . . Although the state bears the burden of proof in the trial court, [i]t is the defendant's burden on appeal to show that joinder was improper by proving substantial prejudice that could not be cured by the trial court's instructions to the jury . . . . As we emphasized in *LaFleur*, our appellate standard of review remains intact. Accordingly, [i]n deciding whether to [join informations] for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb.'' (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *James A.*, supra, 345 Conn. 614–15.

"A long line of cases establishes that the paramount concern is whether the defendant's right to a fair trial will be impaired. Therefore, in considering whether joinder is proper, this court has recognized that, [when] evidence of one incident would be admissible at the trial of the other incident, separate trials would provide the defendant no significant benefit. . . . Under such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial. . . . Accordingly, we have found joinder to be proper [when] the evidence of other crimes or uncharged misconduct [was] cross admissible at separate trials. . . . [When] evidence is cross admissible, therefore, our inquiry ends.'' (Citations omitted; internal quotation marks omitted.) *State* v. *LaFleur*, supra, 307 Conn. 155; see *Leconte* v. *Commissioner of Correction*, 207 Conn. App. 306, 327, 262 A.3d 140 ("[I]t is well established that [when] the evidence in one case is

State *v.* Michael R.

cross admissible at the trial of another case, the defendant will not be substantially prejudiced by joinder. . . . Our case law is clear that a court considering joinder need not apply the *Boscarino* factors if evidence in the cases is cross admissible." (Internal quotation marks omitted.)), cert. denied, 340 Conn. 902, 263 A.3d 387 (2021). "To be cross admissible, the evidence must be both relevant and more probative than prejudicial. See Conn. Code Evid. § 4-3 ('[r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence'); see also *State* v. *Campbell*, 328 Conn. 444, 522, 180 A.3d 882 (2018) ('[f]or prior misconduct evidence to be admissible, it must not only be relevant and material, but also more probative than prejudicial')." *State* v. *James A.*, supra, 345 Conn. 615–16.

With this legal framework in mind, we start by determining whether the evidence of the sexual and nonsexual offenses was cross admissible, such that evidence in each case would have been admissible in the other cases. Under § 4-5 of the Connecticut Code of Evidence, evidence of other crimes, wrongs, or acts of a person is generally inadmissible to prove the bad character, propensity, or criminal tendencies of that person. Conn. Code Evid. § 4-5 (a).[16] Uncharged misconduct evidence, however, "is admissible [first] if it is relevant and material to at least one of the circumstances encompassed by the exceptions and [second] if the probative value of the evidence outweighs any

_____

[16] Section 4-5 (b) of the Connecticut Code of Evidence, which is not at issue in this case, provides in relevant part that "[e]vidence of other sexual misconduct is admissible in a criminal case to establish that the defendant had a tendency or a propensity to engage in aberrant and compulsive sexual misconduct if" certain safeguards are met.

State *v.* Michael R.

prejudicial effect.'' (Internal quotation marks omitted.) *State* v. *Campbell*, supra, 328 Conn. 518.

It is well established that ''[e]vidence of other crimes, wrongs or acts of a person is admissible . . . to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony.'' Conn. Code Evid. § 4-5 (c). Thus, the fact ''[t]hat evidence tends to prove the commission of other crimes by the accused does not render it inadmissible if it is otherwise relevant and material.'' (Internal quotation marks omitted.) *State* v. *Arias*, 322 Conn. 170, 183, 140 A.3d 200 (2016).

Because our analysis begins with whether the evidence is relevant and material to at least one of the circumstances encompassed by the exceptions, we briefly review the relevant exceptions to § 4-5 (a) of the Connecticut Code of Evidence before considering their application to this case for purposes of cross admissibility. First, it is well established that uncharged misconduct evidence is admissible to prove motive and intent. See, e.g., *State* v. *Crenshaw*, 313 Conn. 69, 87–88 n.11, 95 A.3d 1113 (2014); *State* v. *James*, 211 Conn. 555, 578, 560 A.2d 426 (1989), overruled on other grounds by *State* v. *Douglas C.*, 345 Conn. 421, 285 A.3d 1067 (2022). Second, ''such evidence may be used to complete the story of the crime on trial by placing it in the context of nearby and nearly contemporaneous happenings.'' (Internal quotation marks omitted.) *State* v. *Vega*, 259 Conn. 374, 396–97, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002); see, e.g., *State* v. *Crenshaw*, supra, 85 (evidence from both informations ''would have been admissible to establish the complete story of what had happened to the victim''); *State* v. *Vega*, supra, 396–98 (evidence of defendant's prior misconduct substantiated theory that there

State *v.* Michael R.

existed system of criminal activity on part of defendant). Finally, uncharged misconduct evidence is also admissible to corroborate crucial prosecution testimony. See, e.g., *State* v. *Cooper*, 227 Conn. 417, 425, 630 A.2d 1043 (1993) (evidence of defendant's prior misconduct corroborated other testimony in state's case indicating that defendant sold drugs and that victim was shot for interfering with defendant's drug related activity); *State* v. *Gerald A.*, 183 Conn. App. 82, 100, 107–108, 191 A.3d 1003 (evidence of intimate partner violence was admissible to corroborate crucial prosecution testimony, specifically, testimony about why children waited to report alleged sexual abuse), cert. denied, 330 Conn. 914, 193 A.3d 1210 (2018).

Our review of the record reveals that the trial court reasonably concluded that the evidence relating to both the sexual offenses and the nonsexual offenses would be relevant in each case—all of which involved the same victim—to prove the state's theory as to the defendant's motive for committing all of the charged offenses, namely, that he was motivated by his sexual interest in, and obsession with, G. See *State* v. *Patrick M.*, 344 Conn. 565, 598, 280 A.3d 461 (2022) ("evidence of uncharged misconduct involving the same victim is especially relevant to demonstrate motive"); *State* v. *Gonzalez*, 167 Conn. App. 298, 310, 142 A.3d 1227 ("[w]hen instances of a criminal defendant's prior misconduct involve the same victim as the crimes for which the defendant . . . is being tried, those acts are especially illuminative of the defendant's motivation and attitude toward that victim, and, thus, of his intent as to the incident in question" (internal quotation marks omitted)), cert. denied, 323 Conn. 929, 149 A.3d 500 (2016). Specific evidence suggestive of the defendant's motive relating to the sexual offenses included G's testimony recounting the sexual abuse, the defendant's gifting G with a cell phone and prohibiting R from seeing

State *v.* Michael R.

it, the defendant's tracking of G via the phone's global positioning system and asking her to send daily "selfies" and nude photographs, which were indicative of his motive for hitting G with a belt for not following his various phone rules, and the defendant's following G's school van route after she had been removed from R's care.[17]

Similar to consciousness of guilt, a defendant's conduct following an alleged criminal act can also be illustrative of his motive. See *State* v. *DePastino*, 228 Conn. 552, 563, 638 A.2d 578 (1994) ("[i]n a criminal trial, it is relevant to show the conduct of an accused, as well as any statement made by him subsequent to the alleged criminal act, which may fairly be inferred to have been influenced by the criminal act" (internal quotation marks omitted)). The defendant's otherwise nonsexual conduct of watching and following G on her way to school and hitting her with a belt to punish her for not complying with his desire for "selfies" "may fairly be inferred to have been influenced by the criminal act" of sexually assaulting her. (Internal quotation marks omitted.) *State* v. *Coccomo*, 302 Conn. 664, 671, 31 A.3d 1012 (2011). All of these acts, including the sexually assaultive conduct, are tied together by the defendant's obsession with and desire to control G.

From this evidence, the trial court reasonably concluded that, with respect to all of the charges, evidence relating to each crime would be probative to show a genuine connection between the defendant's sexual conduct and nonsexual conduct, to corroborate crucial prosecution testimony, and to establish the complete story of G's sexual abuse. This evidence was offered to establish the defendant's motive and intent as to each crime, which had a tendency to make it more probable that the defendant committed each crime. See,

_____

[17] See part IV of this opinion.

State *v.* Michael R.

e.g., *State* v. *Esposito*, 192 Conn. 166, 169, 471 A.2d 949 (1984) ("evidence of crimes so connected with the principal crime by circumstance, motive, design, or innate peculiarity, that the commission of the collateral crime tends directly to prove the commission of the principal crime, or the existence of any essential element of the principal crime, is admissible" (internal quotation marks omitted)).

We also conclude that, given these circumstances, the evidence of the sexual offense charges was more probative than prejudicial with respect to the nonsexual offense charges, and vice versa. It is well settled that damaging evidence is inadmissible only if it creates "undue prejudice so that it threatens an injustice were it to be admitted. . . . [Accordingly] [t]he test for determining whether evidence is unduly prejudicial is not whether it is damaging to the [party against whom the evidence is offered] but whether it will *improperly* arouse the emotions of the jur[ors]." (Emphasis altered; internal quotation marks omitted.) *State* v. *Jacobson*, 283 Conn. 618, 639, 930 A.2d 628 (2007). Despite the relative severity of the evidence relating to G's sexual exploitation compared to that of the belt and stalking incidents, the prejudicial effect of joining the various charges for trial was mitigated by the fact that this case involved only a single victim, with the charges providing context and motive for the defendant's actions—both sexual and nonsexual—as to that single victim. Cf. *State* v. *James A.*, supra, 345 Conn. 628 (although two sexual assault cases with two different victims were more brutal and shocking than joined threatening and disorderly conduct cases, disparity between cases was not so great that evidence related to sexual assault cases was more prejudicial than probative in threatening and disorderly conduct cases). Although testimony regarding sexual misconduct has the potential to affect a jury's ability to consider separate charges fairly and impartially; see,

State *v.* Michael R.

e.g., *State* v. *Ellis*, 270 Conn. 337, 377, 852 A.2d 676 (2004); that potential was mitigated in the present case when the trial court instructed the jury on multiple occasions that the evidence for each charge must be considered separately.[18] For these reasons, we conclude that the probative value of such evidence outweighed any potential prejudicial effect on the defendant.[19] Accordingly, we conclude that the trial court did not abuse its discretion in denying the defendant's motion to sever the offenses and in joining the informations for trial.

[18] On the first day of trial, after reviewing the three informations for the jury, the trial court instructed the jury: "Each charge against the defendant is set forth in each information as a separate count, and you must consider each count and each information separately in deciding this case."

Following closing arguments, the court charged the jury: "The defendant is charged with a total of nine counts distributed through three different informations. The defendant is entitled to and must be given by you a separate and independent determination of whether he is guilty or not guilty as to each of the counts. Each of the counts charged is a separate crime. The state is required to prove each element in each count beyond a reasonable doubt. . . . You may find that some evidence applies to more than one count. The evidence, however, must be considered separately as to each element in each count. Each count is a separate entity.

\* \* \*

"The defendant is entitled to an independent determination of whether he is guilty or not guilty as to each of the counts in each of the three informations. . . . Each of the counts charged is a separate crime. The state is required to prove each element in each count, in each of the three informations, beyond a reasonable doubt. . . . You may find that some evidence applies to more than one count, and it may apply to different counts in any or all of the three informations. The evidence, however, must be considered separately as to each element, in each count, in each information. Each count is a separate entity.

\* \* \*

"You will recall that I have told you, and I repeat now, you must consider each count, in each information, separately."

[19] Because the evidence from each alleged crime would have been cross admissible in different trials, our inquiry does not address the defendant's contention that the shocking and brutal nature of the sexual offenses unduly prejudiced him under *Boscarino*. See, e.g., *State* v. *James A.*, supra, 345 Conn. 629; *State* v. *Crenshaw*, supra, 313 Conn. 83–84. We acknowledge, however, that the trial court was mindful of the risk of unfair prejudice to the defendant in concluding that the *Boscarino* factors favoring joinder outweighed the risk of unfair prejudice to the defendant.

## II

We next turn to the defendant's constitutional challenges to his conviction of employing a minor in an obscene performance in violation of § 53a-196a (a) (1). Although he casts one claim as a vagueness due process challenge and the other as a first amendment challenge, it appears that both claims challenge the line at which nude photographs of a minor become criminal in nature.

The record reveals the following additional relevant facts. The Cellebrite extraction of G's cell phone revealed that it contained several nude images of G. In these photographs, G is either standing or sitting with her breasts in the center of each image, some with her naked body partially covered by the stuffed sloth and some without. There is also a nude photograph of G with her arms extended on both sides, exposing her breasts and the top of her pubic area. Accompanying these photographs is a series of text messages from the defendant directing G to stand in certain poses, which correlate to the poses in the photographs. The defendant instructed G that he wanted one "with slothy" and directed her to "[w]alk up to the camera to where you[r] head is at the top of the photo and your feet are at the bottom." He then instructed her to provide "one of slothy by himself and one of you by yourself," one with "you sitting where slothy was," and to "[s]it on the couch just like [how the defendant was sitting] and [to] make the same pose." "Almost perfect . . . too much space above your head . . . can't see your toes . . . you're not sitting up straight . . . and I want you to hold your hair up with your hands." When the police executed a search warrant at the defendant's home, they found a legal, adult pornographic DVD, which showed a young woman holding her hair up with her hands on the cover.[20]

---

[20] The Cellebrite extraction also revealed text messages from the defendant to the group chat with R and G about G's breasts, stating that he was "gonna call [G's] boobs '[p]uffkins' " or "[p]uffy puffkins" and that "[t]hey're cute

State *v.* Michael R.

A

We begin with the defendant's claim that § 53a-196a (a) (1), the obscene performance statute, is unconstitutionally vague as applied to his conduct, in violation of his right to due process, because the statutory elements are not adequately defined to pass constitutional muster and fail to provide fair and adequate notice that his conduct with respect to the photographs of G was criminal. The defendant's reliance on the dissenting opinion in *Commonwealth* v. *Sullivan*, 82 Mass. App. 293, 972 N.E.2d 476, review denied, 463 Mass. 1112, 979 N.E.2d 224 (2012), suggests that he challenges the applicable definitions of the statute's requisite "obscen[ity] as to minors"; General Statutes § 53a-193 (2); which, as charged in this case, requires the "depict[ion] [of] a *prohibited sexual act* [that], taken as a whole . . . is harmful to minors." (Emphasis added.) General Statutes § 53a-193 (2). The "prohibited sexual act" charged in this case was a "nude performance"; General Statutes § 53a-193 (3) and (4). Thus, it appears that the defendant contends that the requisite nudity must be part and parcel of a sexual act, insofar as he argues that none of the photographs depicts G engaging in any sexual

. . . ." On December 5, 2017, R placed a controlled phone call to the defendant under Masi's direction. During the call, R informed the defendant that her children had been removed from her care due to evidence that he sexually abused G. Denying any sexual contact with G, and admonishing R for giving the police "unrestricted access to everything in [G's] phone," the defendant noted that the "only" evidence the police could "possibly have is the fucking photo, that's it." During the phone call, the defendant acknowledged that the photographs could be "indecent" and "inappropriate" but argued that they did not prove sexual abuse, stating: "[M]aybe they saw the one of her [arms] spread eagle, and maybe they think there's something wrong with that. I'm not even in that picture. All they have proof of, right now as far as I know . . . unless they have something that I don't know they have . . . is inappropriate pictures. That does not prove any kind of sexual assault whatsoever. That just proves indecent pictures." The defendant went on to instruct R on how to respond to police questioning regarding the accusations. Following this phone call, the defendant texted R and G, asking for G's cell phone back approximately twelve times within a twenty-six hour period.

State *v.* Michael R.

conduct, activity, or other "prohibited sexual act." The defendant also argues that G's self-taken, still cell phone images are not a "performance" under § 53a-196a (a) (1). In support of his claim, the defendant contends that there is a definitional conflict between § 53a-193 (11), defining "performance" to require "play, motion picture, dance, or other *exhibition performed*"; (emphasis added); and § 53a-193 (4), which defines a "nude performance" to require the "*showing*" of the "female genitals, pubic area, or buttocks" or the "female breast with less than a fully opaque covering of any portion thereof below the top of the nipple . . . ." (Emphasis added.)

The state, relying on *State* v. *Ehlers*, 252 Conn. 579, 595–96 and n.19, 750 A.2d 1079 (2000), and *State* v. *Sorabella*, 277 Conn. 155, 188–89, 891 A.2d 897 (2006), overruled on other grounds by *State* v. *Douglas C.*, 345 Conn. 421, 285 A.3d 1067 (2022), contends that Connecticut case law gave the defendant clear notice that his conduct was prohibited because these cases hold that photographs taken for a defendant's personal viewing can constitute an "exhibition" and, thus, a "performance." The state argues that the defendant thereby had notice of the broader meaning of the term "exhibition" in child pornography statutes. The state also contends that there is no statutory conflict at issue because the words "exhibition" and "showing" are synonymous and because a "performance" need not be "nude" to be obscene. We agree with the state and conclude that the statute is not unconstitutionally vague as applied to the defendant's conduct because he had fair and adequate notice that it prohibited nude photographs of a nine year old child in suggestive poses that were directed by the defendant in his text messages to G.

It is well established that, under both the federal and Connecticut constitutions,[21] "[t]he vagueness doctrine

_____

[21] "The defendant did not raise separate vagueness claims under the federal and state constitutions. We previously have equated [the] vagueness doctrine

State *v.* Michael R.

derives from two interrelated constitutional concerns.
. . . First, statutes must provide fair warning by ensur-
ing that [a] person of ordinary intelligence [has] a rea-
sonable opportunity to know what is prohibited, so that
he may act accordingly. . . . Second, in order to avoid
arbitrary and discriminatory enforcement, statutes
must establish minimum guidelines governing their
application.'' (Internal quotation marks omitted.) *State*
v. *Roy D. L.*, 339 Conn. 820, 857, 262 A.3d 712 (2021). "A
party attacking the constitutionality of a validly enacted
statute bears the heavy burden of proving its unconstitu-
tionality beyond a reasonable doubt . . . [and we]
indulge in every presumption in favor of the statute's
constitutionality . . . . The determination of whether
a statutory provision is unconstitutionally vague is a
question of law over which we exercise de novo review.''
(Citation omitted; internal quotation marks omitted.) Id.

Although the defendant failed to raise a vagueness
claim at trial, we review his claim under *State* v. *Gold-
ing*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as
modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120
A.3d 1188 (2015),[22] "because the record is adequate for
our review, and a claim that a statute is unconstitution-
ally vague implicates a defendant's fundamental due
process right to fair warning.'' *State* v. *Coleman*, 83

under the two [constitutions] and have declined to analyze vagueness claims
any differently under the Connecticut constitution.'' *State* v. *Winot*, 294
Conn. 753, 758 n.5, 988 A.2d 188 (2010). In the absence of an independent
state constitutional challenge, we continue to adhere to that approach in
the present case and confine our analysis to the first amendment.

[22] "[A] defendant can prevail on a claim of constitutional error not pre-
served at trial only if *all* of the following conditions are met: (1) the record is
adequate to review the alleged claim of error; (2) the claim is of constitutional
magnitude alleging the violation of a fundamental right; (3) the alleged
constitutional violation . . . exists and . . . deprived the defendant of a
fair trial; and (4) if subject to harmless error analysis, the state has failed
to demonstrate harmlessness of the alleged constitutional violation beyond
a reasonable doubt.'' (Emphasis in original; footnote omitted.) *State* v. *Gold-
ing*, supra, 213 Conn. 239–40; see *In re Yasiel R.*, supra, 317 Conn. 781
(modifying third prong of *Golding*).

State *v.* Michael R.

Conn. App. 672, 676–77, 851 A.2d 329, cert. denied, 271 Conn. 910, 859 A.2d 571 (2004), cert. denied, 544 U.S. 1050, 125 S. Ct. 2290, 161 L. Ed. 2d 1091 (2005). "The proper test for determining [whether] a statute is vague as applied is whether a reasonable person would have anticipated that the statute would apply to his or her particular conduct. . . . The test is objectively applied to the actor's conduct and judged by a reasonable person's reading of the statute . . . . [O]ur fundamental inquiry is whether a person of ordinary intelligence would comprehend that the defendant's acts were prohibited . . . ." (Internal quotation marks omitted.) *State* v. *Roy D. L.*, supra, 339 Conn. 858; see *State* v. *Pickering*, 180 Conn. 54, 61, 428 A.2d 322 (1980) ("a penal statute may survive a vagueness attack solely upon a consideration of whether it provides fair warning"). "[P]ursuant to General Statutes § 1-1 (a), [i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language . . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine [whether] it gives fair warning." (Internal quotation marks omitted.) *State* v. *Lori T.*, 345 Conn. 44, 57, 282 A.3d 1233 (2022). "A statute is not unconstitutional merely because a person must inquire further as to the precise reach of its prohibitions." (Internal quotation marks omitted.) Id., 67.

Section "53a-196a (a) (1) is part of the statutory scheme governing obscenity related offenses." *State* v. *Ernesto P.*, 135 Conn. App. 215, 227, 41 A.3d 1115, cert. denied, 305 Conn. 912, 45 A.3d 98 (2012). We begin with the statute's text, which provides in relevant part: "A person is guilty of employing a minor in an obscene performance when such person . . . employs any minor, whether or not such minor receives any consideration, for the purpose of promoting any material or perfor-

State *v.* Michael R.

mance which is *obscene as to minors, notwithstanding that such material or performance is intended for an adult audience . . . .*" (Emphasis added.) General Statutes § 53a-196a (a) (1). Any "[m]aterial or performance is 'obscene as to minors' if it depicts a *prohibited sexual act* and, taken as a whole, it is harmful to minors." (Emphasis added.) General Statutes § 53a-193 (2). Included in the enumerated list of "[p]rohibited sexual act[s]" in § 53a-193 (3) is a "nude performance . . . ."[23] A "nude performance" is statutorily defined in relevant part as "the *showing* of the human male or female genitals, pubic area or buttocks with less than a fully opaque covering, or the *showing* of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple . . . in any . . . *exhibition performed before an audience.*" (Emphasis added.) General Statutes § 53a-193 (4).

We summarily dispose of the defendant's arguments that there is a definitional conflict between the term "performance" in § 53a-193 (11) and the term "showing" in § 53a-193 (4), and that the term "performance" is not adequately defined. To convict the defendant under § 53a-196a (a) (1), the state was required to prove that the defendant employed a minor "for the purpose of promoting any *material* or *performance*" that "is *obscene as to minors* . . . ." (Emphasis added.) General Statutes § 53a-196a (a) (1). With respect to any "material or performance," our statutory scheme related to obscenity offenses defines "material" as "anything tangible which is capable of being used or adapted to arouse prurient, shameful or morbid interest"; General Statutes § 53a-193 (10); and a "performance" as "any play, motion picture, dance *or other exhibition* per-

[23] A "prohibited sexual act" is defined as "erotic fondling, nude performance, sexual excitement, sado-masochistic abuse, masturbation or sexual intercourse." General Statutes § 53a-193 (3).

State *v.* Michael R.

formed before an audience.''[24] (Emphasis added.) General Statutes § 53a-193 (11).

Because § 53a-193 does not define the term "exhibition," we look to the common meaning of the word. See, e.g., *State* v. *Lori T.*, supra, 345 Conn. 57; *Stone-Krete Construction, Inc.* v. *Eder*, 280 Conn. 672, 677–78, 911 A.2d 300 (2006). Merriam-Webster's Collegiate Dictionary defines "exhibition" as "an act or instance of exhibiting" and "exhibit" as "to present to view . . . to show or display outwardly [especially] by visible signs or actions . . . .'' Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) pp. 437–38. Thus, the text of the statute makes it clear that the defendant was prohibited from employing a minor to promote an *exhibition*, which, among other things, depicts a prohibited sexual act, such as a nude performance *showing* certain body parts.[25] Photographs, of course, show people or things in a visual manner. Accordingly, this leaves us only with the question of whether a reasonable person would have anticipated that directing a nine year old child to send posed, nude images was a "nude performance" under the statute.

Consistent with the defendant's reliance on Justice James R. Milkey's dissenting opinion in *Commonwealth* v. *Sullivan*, supra, 82 Mass. App. 322, we understand his argument to be that the term "nude performance" is itself vague in the absence of a judicial gloss that restricts its reach only to nudity of a sexual nature. See

---

[24] It is undisputed that the photographs are not a play, motion picture, or dance.

[25] To "promote" any material "means to manufacture, issue, sell, give, provide, lend, mail, deliver, transfer, transmit, publish, distribute, circulate, disseminate, present, exhibit, advertise, produce, *direct or participate in*'' it. (Emphasis added.) General Statutes § 53a-193 (12); see, e.g., *State* v. *George A.*, 308 Conn. 274, 282–86, 63 A.3d 918 (2013) (video recordings from defendant's computer of victim crushing mice with feet, combined with victim's testimony of defendant's related fetishes, was sufficient to sustain obscene performance conviction).

State *v.* Michael R.

*United States* v. *Lanier*, 520 U.S. 259, 266, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997) (requisite clarity "may be supplied by judicial gloss on an otherwise uncertain statute"). In *Sullivan*, the majority concluded that the *Dost* factors[26] were useful in determining whether a photograph of a girl "on the cusp of puberty" posing on a beach in a sexually suggestive manner was "lewd" under a Massachusetts child pornography statute. (Internal quotation marks omitted.) *Commonwealth* v. *Sullivan*, supra, 301, 304–305. Determining that the photograph constituted a lewd exhibition, the majority concluded that a photograph does not need to be obscene or to "capture [a] child engaged in sexual activity" to be considered lewd. Id., 307. In his dissent, however, Justice Milkey concluded that a visual depiction of a naked child rises to the level of a "lewd exhibition" only when it "sexually exploit[s] [a] child in a manner akin to that done by a photograph of [a] child engaged in the prohibited sex acts listed in the [statute]." (Internal quotation marks omitted.) Id., 322 (Milkey, J., dissenting).

---

[26] The *Dost* factors were articulated in the decision of the United States District Court for the Southern District of California in *United States* v. *Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986), aff'd, 813 F.2d 1231 (9th Cir. 1987), and aff'd sub nom. *United States* v. *Wiegand*, 812 F.2d 1239 (9th Cir.), cert. denied, 484 U.S. 856, 108 S. Ct. 164, 98 L. Ed. 2d 118 (1987). In *Dost*, the District Court determined that whether a visual depiction of a minor constitutes a "lascivious exhibition of the genitals or pubic area" should be made on a case-by-case basis considering the context of the image, and that the trier of fact "should look to the following factors, among any others that may be relevant in the particular case: [1] whether the focal point of the visual depiction is on the child's genitalia or pubic area; [2] whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity; [3] whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child; [4] whether the child is fully or partially clothed, or nude; [5] whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; [and] [6] whether the visual depiction is intended or designed to elicit a sexual response in the viewer." (Internal quotation marks omitted.) Id., 832. We, like most of the federal courts of appeals, have found the *Dost* factors to be helpful in determining whether a photograph is lascivious. See *State* v. *Sawyer*, 335 Conn. 29, 41–43, 225 A.3d 668 (2020).

State *v.* Michael R.

Even if we were to assume that any material must contain a sexual component to save the term "nude performance" from a vagueness challenge, Connecticut case law provides ample notice that a reasonable person would anticipate that the images at issue in this case cross that constitutionally imposed line, in light of the circumstances under which they were created. "[P]rior decisions of this court [that] delineate a statute's reach can constitute sufficient notice of the acts prohibited to render the statute constitutional as applied to the particular facts of a case." *State* v. *Pickering*, supra, 180 Conn. 63; see, e.g., *State* v. *Sorabella*, supra, 277 Conn. 193 (fact that other courts have taken same position that defendant argues person of ordinary intelligence would not have understood "alone provides a sufficient basis for rejecting the defendant's constitutional vagueness challenge because the defendant must be deemed to be on notice of that body of case law"); *State* v. *Ehlers*, supra, 252 Conn. 589 (defendant could not prevail on facial vagueness claim, even if statute was vague in some applications, because first amendment was not implicated, and, because statute was not vague as applied to his conduct, defendant could not challenge statute on due process grounds).

An array of decisions from this court and the Appellate Court provide ample notice that nude photographs akin to those recovered from G's cell phone are well within the ambit of the statute. See, e.g., *State* v. *Sorabella*, supra, 277 Conn. 186–87 (reiterating that "nude performance" includes "the showing of the female breast with less than a fully opaque covering" in case involving photographs of thirteen year old girl, who was naked from waist up (internal quotation marks omitted)); *State* v. *Ehlers*, supra, 252 Conn. 581 (numerous photographs of nude, young children, some depicting children performing sex acts); *State* v. *Zarick*, 227 Conn. 207, 213, 630 A.2d 565 (photographs depicted breasts and

State *v.* Michael R.

genitalia of children, naked children in sexually explicit positions, and "costumed children wearing heavy makeup in sexually suggestive poses"), cert. denied, 510 U.S. 1025, 114 S. Ct. 637, 126 L. Ed. 2d 595 (1993); *State* v. *Ernesto P.*, supra, 135 Conn. App. 218–19 (it was undisputed that photographs of victim contained exhibitions of genitals, pubic area, buttocks, and breasts when defendant took photographs of naked victim exposing such areas); *State* v. *Parsons*, 28 Conn. App. 91, 95, 612 A.2d 73 (photographic contact sheet contained numerous photographs, taken by defendant, of victim clothed only in T-shirt, focusing primarily on victim's buttocks), cert. denied, 223 Conn. 920, 614 A.2d 829 (1992). These decisions make clear that directing a child to pose fully or partially nude for photographs in an objectively sexual manner is an exhibition or a showing within the meaning of the term "nude performance" and, therefore, violates § 53a-196a (a) (1).

These cases gave fair warning to the defendant that his conduct in directing and posing G in the photographs was criminal at the time he engaged in it. The photographs squarely foreclose any claim that the text of § 53a-196a (a) (1) is vague as applied to the defendant's conduct, and his textual claims regarding the vagueness of "nude performance" are without merit. "This is not a situation [in which] the state is holding an individual 'criminally responsible for conduct [that] he could not [have] reasonably underst[ood] to be proscribed.' *United States* v. *Harriss*, [347 U.S. 612, 617, 74 S. Ct. 808, 98 L. Ed. 989 (1954)]. On the contrary, this is an instance [in which] the statute 'as authoritatively construed [applies] without question to certain activities.' *Smith* v. *Goguen*, [415 U.S. 566, 578, 94 S. Ct. 1242, 39 L. Ed. 2d 605 (1974)]." S*tate* v. *Pickering*, supra, 180 Conn. 64–65. Accordingly, we conclude that the defendant's vagueness challenge fails as a matter of law.

State *v.* Michael R.

B

The defendant also seeks an independent appellate review of his conviction for violating § 53a-196a under the first amendment to the United States constitution, arguing that the images are not obscene. Although he never claimed a first amendment violation at trial, the defendant argues that the images were not obscene as to minors and that the record is adequate for review under *State* v. *Golding*, supra, 213 Conn. 239–40. In support of this contention, the defendant relies on *State* v. *Whited*, 506 S.W.3d 416 (Tenn. 2016), and asks us to review the content of the material at issue to determine whether it includes a lascivious exhibition of a child, to support his argument that, viewed objectively, the images of G are not sexual or lascivious and, therefore, are protected by the first amendment. The state counters that the defendant's conviction did not violate the first amendment because § 53a-196a is consistent with the United States Supreme Court's definition of obscenity in *Miller* v. *California*, 413 U.S. 15, 24, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973), under which sexualized photographs of children need not depict them explicitly engaged in sexual acts to be patently offensive and, thus, harmful to minors. We agree with the state.

Before addressing these arguments, we set forth the applicable standard of review. "In certain first amendment contexts . . . appellate courts are bound to apply a de novo standard of review. . . . [I]n cases raising [f]irst [a]mendment issues [the United States Supreme Court has] repeatedly held that an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression. . . . Therefore, even though, ordinarily . . . [f]indings of fact . . . shall not be set aside unless clearly erroneous, [appellate courts] are obliged to make a fresh examination of crucial facts

State *v.* Michael R.

under the rule of independent review.'' (Citations omitted; internal quotation marks omitted.) *DiMartino* v. *Richens*, 263 Conn. 639, 661–62, 822 A.2d 205 (2003); see *Miller* v. *California*, supra, 413 U.S. 25 (independent appellate review of finding of obscenity).

It is well established that obscenity is not a category of expression protected by the first amendment. See, e.g., *New York* v. *Ferber*, 458 U.S. 747, 754, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982); *State* v. *Zarick*, supra, 227 Conn. 220. The constitutional definition of obscenity is articulated in *Miller* v. *California*, supra, 413 U.S. 24.[27] See *State* v. *Gagliardi*, 174 Conn. 46, 48, 381 A.2d 1068 (1977) (in determining what is obscene, trier of fact must apply *Miller* guidelines). Section 53a-196a (a) (1) requires that any material or performance be ''obscene as to minors'' and, thus, '' 'harmful to minors,'' to evade first amendment protection. General Statutes § 53a-193 (2) (B). To be ''harmful to minors,'' the material or performance must describe or represent a prohibited sexual act that ''(i) . . . predominantly appeals to the prurient, shameful or morbid interest of minors, (ii) . . . is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and (iii) taken as a whole . . . lacks serious literary, artistic, educational, political or scientific value for minors.'' General Statutes § 53a-193 (2) (B).

Case law has further expounded on the extent to which images of minors become obscene and thereby lose their protection under the first amendment. In

[27] The *Miller* factors are (1) ''whether the average person, applying contemporary community standards would find that the [performance], taken as a whole, appeals to the prurient interest,'' (2) ''whether the [performance] depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law,'' and (3) ''whether the [performance], taken as a whole, lacks serious literary, artistic, political, or scientific value.'' (Internal quotation marks omitted.) *Miller* v. *California*, supra, 413 U.S. 24.

State *v.* Michael R.

*Whited*, on which the defendant relies, the Tennessee
Supreme Court considered the appropriate standard for
determining what constitutes a "lascivious exhibition"
of a minor's private body areas within the meaning of
Tennessee's child exploitation statutes. *State* v. *Whited*,
supra, 506 S.W.3d 419, 430. In that case, the defendant,
who had utilized a hidden camera to capture videos of
minors in various states of undress, including fully nude,
after showering and while changing clothes; id., 418–19;
appealed his conviction under Tenn. Code Ann. § 39-
17-1005 (a) (1) (2012), which prohibited the production
of child pornography, "i.e., material that includes [a]
minor engaging in . . . [s]exual activity." (Internal
quotation marks omitted.) Id., 430. At the time,[28] Tennes-
see's criminal code defined "sexual activity" to include,
inter alia, the "[l]ascivious exhibition of the female
breast or the genitals, [or] buttocks . . . of any per-
son." Tenn. Code Ann. § 39-17-1002 (8) (G) (2012). The
court concluded that "the offense of especially aggra-
vated sexual exploitation of a minor does not include
as an element of the offense the accused's intent or
purpose of sexual arousal or gratification." *State* v.
*Whited*, supra, 441. In doing so, it rejected the use of
the otherwise well established *Dost* factors to deter-
mine what constitutes a "lascivious exhibition" under
Tennessee's sexual exploitation statutes, criticizing it
as a "one-size-fits-all [multifactor] analysis . . . ."
(Internal quotation marks omitted.) Id., 438. The court
reasoned that phrases such as "sexual activity" and
"lascivious exhibition" are terms that "lay people are
perfectly capable of understanding," and that they could
be identified through commonsense observation of the

---

[28] We note that the Tennessee legislature subsequently amended Tenn.
Code Ann. § 39-17-1002 (8) (G) in 2021 to define "sexual activity" as, inter
alia, the "[e]*xhibition* of the breast, genitals, [or] buttocks . . . of any minor
that can be reasonably construed as being for the purpose of the sexual
arousal or gratification of the defendant or another." (Emphasis added.)
Tenn. Code Ann. § 39-17-1002 (8) (G) (2021).

State *v.* Michael R.

features of the material at issue. (Internal quotation marks omitted.) Id., 437.

The court in *Whited* determined that hidden camera videos depicting two minors changing out of their bikini swimsuits into dry clothes and entering and exiting the shower did not rise to a level at which a trier of fact could reasonably find that the videos objectively included "sexual activity . . . ." (Internal quotation marks omitted.) Id., 447. Although the hidden camera was positioned to capture the minors' nude bodies in the center of the screen, nothing in the videos indicated that the minors were posed or coached; nor were they in any unnatural or overtly sexual poses. Id., 446. In addition, the camera did not focus or "[zoom] in" on the minors' private areas, and the minors were engaged in everyday activities that were appropriate for the settings, seemingly unaware of the camera. (Internal quotation marks omitted.) Id.

The line of reasoning in *Whited*, however, is inconsistent with our recent analysis of a similar issue in *State* v. *Sawyer*, 335 Conn. 29, 225 A.3d 668 (2020). In *Sawyer*, we considered whether descriptions in a search warrant affidavit were sufficient to support an inference that there was a substantial chance that the defendant was in possession of child pornography. See id., 36, 39. The affidavit in *Sawyer* described one photograph of a naked boy standing with his genitals exposed and one photograph of a naked girl with her hand covering her genital area. See id., 44. In that case, the defendant was convicted of possession of child pornography in the second degree, in violation of General Statutes § 53a-196e. Id., 31. Section 53a-193 (13) defines " 'child pornography' [as] a 'visual depiction' involving a person under sixteen years old engaging in 'sexually explicit conduct . . . .' " Id., 39. Whether the photographs described in the affidavit supporting the search warrant in *Sawyer* depicted " 'sexually explicit conduct' "

State *v.* Michael R.

turned on whether they involved a " 'lascivious exhibition of the genitals or pubic area . . . .' " Id., quoting General Statutes § 53a-193 (14) (E).

As a matter of first impression in *Sawyer*, we adopted a case specific approach to assessing whether a display is lascivious and stated that "the *Dost* factors are generally relevant and provide some guidance" in this evaluation. (Internal quotation marks omitted.) *State* v. *Sawyer*, 335 Conn. 41. Accordingly, because the judge reviewing the warrant in *Sawyer* reasonably could have inferred from the description of the girl's "hand covering her genital area" that the photograph suggested sexual coyness and that she was posed in that manner by a photographer, various *Dost* factors were implicated. (Internal quotation marks omitted.) Id., 44. Although nudity by itself is not pornographic,[29] we concluded in *Sawyer* that the two photographs at issue provided a "fair probability" or a "substantial chance" that the defendant was in possession of lascivious images of children for pur-

[29] It is well established that nudity alone, even when it comes to images of children, is not sufficient to constitute child pornography or to make material obscene under *Miller*. See *State* v. *Sawyer*, supra, 335 Conn. 41 n.7; see, e.g., *United States* v. *Steen*, 634 F.3d 822, 824, 827 (5th Cir. 2011) (surreptitiously filming nude minor sunbathing did not, without more, constitute producing child pornography); *Faloona ex rel. Frederickson* v. *Hustler Magazine, Inc.*, 607 F. Supp. 1341, 1343 n.4 (N.D. Tex. 1985) (nude photographs of plaintiffs were not "child pornography" under *Ferber* because they did not show that plaintiffs engaged in sexual activity or in lewd exhibition of genitals (internal quotation marks omitted)), aff'd, 799 F.2d 1000 (5th Cir. 1986), cert. denied, 479 U.S. 1088, 107 S. Ct. 1295, 94 L. Ed. 2d 151 (1987); *Commonwealth* v. *Rex*, 469 Mass. 36, 47–48, 11 N.E.3d 1060 (2014) (there was no evidence to support finding of probable cause to arrest defendant for possession of child pornography when, viewing images in light of *Dost* factors, possession of them would not result in continuing victimization of children depicted). It is also apparent that the average person understands the difference between sexually suggestive, posed photographs of nude children and those contained in legitimate educational or artistic materials. See, e.g., *Commonwealth* v. *Rex*, supra, 37, 48 (no grand jury could conclude that photographs of naked children excerpted from National Geographic magazine, sociology textbook, and naturist catalogue constituted lewd exhibition).

State *v.* Michael R.

poses of the court's probable cause determination. (Internal quotation marks omitted.) Id., 44–45.

Although *Whited* and *Sawyer* are somewhat inapposite to the present case given the statutes at issue,[30] they nevertheless support our conclusion that the "selfies" on G's phone could be found, under the principles set forth in both *Miller* and *Dost*, to depict the sexualization that we assume is necessary to constitute a "nude performance" and, thus, to be "harmful to minors." See General Statutes § 53a-193 (4) (defining "nude performance" to require "the showing" of "[the] female genitals, pubic area or buttocks" or "the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple"). Indeed, under *Ferber*, "pornography showing minors can be proscribed whether or not the images are obscene under . . . *Miller* . . . . [The decision in] *Ferber* recognized that [t]he *Miller* standard, like all general definitions of what may be banned as obscene, does not reflect the [s]tate's particular and more compelling interest in prosecuting those who promote the sexual exploitation of children." (Citation omitted; internal quotation marks omitted.) *Ashcroft* v. *Free Speech Coalition*, 535 U.S. 234, 240, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002); see id. ("[p]ictures of young children engaged in certain acts might be obscene [when] similar depictions of adults, or perhaps even older adolescents, would not").

Unlike the hidden camera video recordings depicting nude children engaged in everyday, nonsexual activities

[30] Unlike the child pornography statutes at issue in *Whited* and *Sawyer*, Tenn. Code Ann. § 39-17-1005 (a) (1) (2012) and General Statutes §§ 53a-193 (14) (E) and 53a-196e, respectively, which require the depiction to constitute a "lascivious exhibition," the obscene performance statute, § 53a-196a (a) (1), requires only that that the photographs be "harmful to minors." General Statutes § 53a-193 (2). Further, § 53a-193 (2) (B) defines "harmful to minors" using the obscenity factors enumerated in *Miller* v. *California*, supra, 413 U.S. 24, rather than the lasciviousness factors set forth in *United States* v. *Dost*, supra, 636 F. Supp. 832.

State *v.* Michael R.

in *Whited*, given G's age, G's sexually suggestive placements and poses at the defendant's instruction through text messages, both fully nude and partially covered, taken as a whole, lead us to conclude that the photographs depict a degree of sexual activity and, as such, are "harmful to minors." They were therefore obscene and not protected by the first amendment.

III

We now consider the defendant's claim that the trial court improperly excluded from evidence the video recordings of two forensic interviews of G. Specifically, the defendant argues that the first forensic interview was completely exculpatory, rendering it critical to his defense against the charges of sexual assault in the first degree and risk of injury to a child based on sexual conduct. The defendant argues that the trial court improperly declined to allow him to refresh G's recollection when asking her whether she remembered the first forensic interview, thereby preventing him from impeaching her with her prior inconsistent statement. The defendant also argues that the trial court abused its discretion by not giving him a chance to "authenticate" both videos when he offered them as evidence through his expert witness. He contends that the improper exclusion of this exculpatory video evidence prejudiced him and violated his constitutional rights to confront the complainant and to present a defense.

The state argues in response that the trial court properly excluded the forensic interviews because the defendant failed to satisfy the requirements of the Connecticut Code of Evidence for refreshing recollection, impeachment, or admission of the interviews as exhibits. Alternatively, the state posits that any error was harmless. We conclude that any claimed error with respect to the video recordings was harmless beyond a reasonable doubt.

State *v.* Michael R.

The record reveals the following additional relevant facts. In connection with the investigation of the allegations against the defendant, G was twice interviewed by Williams, the forensic interviewer at the Center for Youth and Families. The recording of the first interview, which was conducted on December 11, 2017, reveals that Williams and G used a marker to identify G's family members, as well as the different parts of the male and female body, on images placed on an easel. During this first interview, G initially denied any alleged sexual abuse by the defendant.

The second interview was conducted approximately six months later, on June 22, 2018. During the second interview, G disclosed the sexual abuse by the defendant, stating that, at R's house and when she slept at the defendant's house, the defendant, among other things, "took his private part and touched it with [hers]" more than once. When Williams asked G to clarify the meaning of the word "privates," G used a marker to circle the penis on a photograph of a man and the vagina on a photograph of a woman. When asked if the defendant's private parts had touched G's private parts on the "inside . . . outside, or something else," G replied that the defendant had touched her on the "outside" and that it felt "weird." She also stated that, at the defendant's house, "white stuff" would come out of his penis when this would happen. As the conversation progressed, G indicated that the defendant had also touched her vagina with his hand. When asked whether the defendant's hand had touched G's private parts on the "inside . . . outside, or something else," G stated: "I don't know. Well, I do know, but I don't really know the word for it." When asked again, G stated that it was "like the middle-ish" and it felt "weird." G also stated that she did not have clothes on when this would happen.

At trial, G testified that the defendant had touched her breasts and vagina with his mouth, fingers, and

State *v.* Michael R.

penis. When the prosecutor asked whether the defendant's "parts ever [went] inside [her] vagina," G replied, "[a] little bit." When asked whether "anything [had] ever come out of his private part," G replied, "[y]es," and indicated that the substance was white in color.

Following the prosecutor's direct examination of G, the defendant asked for time to gather himself and compose some questions for cross-examination. After the jury was excused, the defendant informed the trial court that he was not prepared to cross-examine G at that time because he could not formulate his questions the night before, as he lacked access to a pen while he was incarcerated awaiting trial. The trial court then asked the prosecutor if he had previously prepared discovery regarding G's prior statements and given it to the defendant. The prosecutor replied that the defendant had an opportunity to watch the forensic interviews multiple times, confirmed that "the same basic . . . evidence came out on those occasions," and assured the court that, "[i]n the second one, same basic—yes." G and the jury then returned to the courtroom.

Before the defendant cross-examined G, the trial court directed the defendant not to ask questions in a manner that would be intimidating to a child. During his cross-examination, the defendant asked G whether she had previously denied, on several occasions, that he had done anything inappropriate or touched her in an inappropriate way. G testified that she had denied any abuse on three occasions because she had feared that R would get scared and "really mad," and that she did not tell anyone else because she had "no idea what was going on" at the time. After further attempts to inquire into whether G could have confided in other people about the abuse, the defendant asked G whether she remembered being interviewed by Williams. The trial court then took a short recess, warned the defendant of its belief that his line of questions was becoming

intimidating in nature, and encouraged him to "focus on what matters and not tangential matters that are not relevant."

After that recess, the defendant again asked G if she recalled sitting for an interview with Williams and if she recalled using markers. G stated that she remembered having an interview and using markers but was not sure who had interviewed her or what the markers were used for. The defendant then asked, "[d]o you remember, in that interview, stating that no one has ever touched you in [your] private parts?" G answered that she remembered talking about what happened, using markers, and telling the interviewer "about the truth but [she] wouldn't say—." The defendant interrupted her, stating, "[s]o, you said you remember talking about the truth . . . [a]nd, during that interview, do you recall telling—or do you recall stating, that no one had touched you in your private parts?"

The prosecutor objected to the form of the question, asking which interview the defendant was referring to, because G had been interviewed twice. In response, the trial court stated that "she recalled an interview. She's not sure with whom, so I think the question has to be about that interview. *Do you have any recollection—so, maybe it would help to focus* [*on*] *that.*" (Emphasis added.) The defendant announced that he had the interviews available, but the trial court again reminded the defendant that G had testified about an interview during which she had told the truth, so he could ask her "what she recall[ed] about that interview."

The defendant then asked G whether she remembered stating, when talking about the truth, that no one had touched her in her private parts, to which she replied, "[n]o. Because why would I lie about—." The trial court again interjected, stating, "[n]ext question." The defendant asked G if she recalled stating what she

State *v.* Michael R.

would do if someone had touched her in her private parts, to which she replied, "[n]o. I don't remember." The defendant attempted to tell the trial court that he had the video recording of the interview available but he was, yet again, instructed, "[n]ext question, Mr. [R]."

The defendant thereafter asked G, "[w]ould it refresh your memory if we played a recording of that material?" Although the prosecutor did not object to the question, the trial court then stated that it was "not clear that she said she didn't have a memory." Instead, the trial court stated that it understood G's answer to be that she did not tell Williams what she would do if someone had touched her in her private parts. Noting its own confusion, the trial court suggested that the defendant clarify his question. The defendant replied that G had made "contradictory statements," to which the trial court stated that it was "not going to argue the law right now," and instructed the defendant to ask another question to help focus what he wanted G to say. The defendant continued to ask G whether she remembered things she said during the first forensic interview and to the pediatrician who examined her bruise but subsequently decided to "move on" to questions regarding the other charges.

Later in the trial, while presenting his defense, and after he recalled Williams as a defense witness, the defendant attempted to introduce video recordings of both forensic interviews as substantive evidence during the testimony of his expert witness, Nancy Eiswirth, a clinical psychologist. The prosecutor objected, acknowledging that the defendant was intending to offer the recordings substantively as prior inconsistent statements; see *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986); see also, e.g., *State* v. *Carrion*, 313 Conn. 823, 830–31, 842, 100 A.3d 361 (2014) (forensic interview of child victim was admissible for substantive

State *v.* Michael R.

purposes); but argued that they were not admissible
because G had not been confronted with the recordings
pursuant to § 6-10 (b) and (c) of the Connecticut Code
of Evidence. The trial court agreed, ruling that, because
Eiswirth could not authenticate the forensic interviews,
and because they otherwise lacked a foundation, they
would remain marked as exhibits only for identification.
The trial court also denied the defendant's request to
call G or Williams at a later date to authenticate the
recordings.

We note that the defendant did not raise his constitu-
tional claims at trial and seeks to prevail under *State*
v. *Golding*, supra, 213 Conn. 239–40. See footnote 22
of this opinion. "This court has long recognized that a
violation of the defendant's right to confront witnesses
is subject to harmless error analysis [under *Golding*'s
fourth prong]." (Internal quotation marks omitted.)
*State* v. *Edwards*, 334 Conn. 688, 706, 224 A.3d 504
(2020). When "the defendant's claim is constitutional
in nature, the state bears the burden of establishing that
this error was harmless beyond a reasonable doubt."
*State* v. *Tyus*, 342 Conn. 784, 813, 272 A.3d 132 (2022).
"Whether any error is harmless in a particular case
depends [on] a number of factors, such as the impor-
tance of the witness' testimony in the prosecution's
case, whether the testimony was cumulative, the pres-
ence or absence of evidence corroborating or contra-
dicting the testimony of the witness on material points,
the extent of cross-examination otherwise permitted,
and, of course, the overall strength of the prosecution's
case. . . . Most importantly, we must examine the
impact of the evidence on the trier of fact and the result
of the trial. . . . If the evidence may have had a ten-
dency to influence the judgment of the jury, it cannot
be considered harmless [beyond a reasonable doubt]."
(Internal quotation marks omitted.) Id., 804; cf. *State*
v. *Payne*, supra, 303 Conn. 553 ("a nonconstitutional

State *v.* Michael R.

error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict'' (internal quotation marks omitted)).

Our review of the record indicates that the defendant attempted to refresh G's recollection with her prior inconsistent statements from the first forensic interview and to offer both forensic interviews through Eiswirth for their substance. Although the trial court was well within its discretion to ensure that the defendant's cross-examination was not abusive or intimidating to G, it should not have injected itself into G's response when the defendant attempted to refresh her recollection, as the questions that the defendant asked at that point were neither tangential nor irrelevant. Given the lack of objection from the prosecutor, the trial court should have permitted G to answer the question asked, which may have provided the defendant with an opportunity to refresh her recollection. This is especially so considering the trial court's previous suggestion that the defendant ask G whether she "ha[s] any recollection" and that "maybe, it would help to focus [on] that." Although the trial court accommodated the defendant in other regards consistent with the established policy of the Connecticut courts to be solicitous of self-represented litigants when it does not interfere with the rights of other parties; see, e.g., *Burton* v. *Dept. of Environmental Protection*, 337 Conn. 781, 803, 256 A.3d 655 (2021); we believe that, in this instance, the trial court's understandable desire to protect G interfered with the defendant's attempts to exercise his right to represent himself. We nevertheless conclude that the trial court's potentially incorrect rulings, including those relating to the authentication of the video recordings,[31] were harmless error beyond a reasonable doubt.

[31] When the defendant attempted to introduce the recordings of the two forensic interviews into evidence through his expert witness, the prosecutor objected on the sole ground that G had not been confronted with her inconsistent statements. The trial court then declared that "there's also no foundation" before acknowledging that the prosecutor was correct regarding

State *v.* Michael R.

With respect to the first interview, we observe that the relevant portions were cumulative of trial testimony clearly establishing that G had, on three occasions, denied any sexual misconduct by the defendant. G's trial testimony and her statements during the first forensic interview thus did not differ in any material way. See, e.g., *State* v. *Francis*, 228 Conn. 118, 126, 635 A.2d 762 (1993) (testimony of four witnesses did not differ in any material way, and trial record would have been substantially same if one witness had not testified). In addition, various other witnesses also testified regarding G's initial denial of the abuse, including two pediatricians and a nurse practitioner who performed a sexual assault examination on G. Thus, had the defendant been successful in his efforts to use the recording of the first interview at trial, that evidence would have established only what the jury already knew from G and the other witnesses, namely, that she initially denied that the defendant had any sexual contact with her. The entirely cumulative nature of the recording of the first interview renders its exclusion harmless beyond a reasonable doubt. See, e.g., *State* v. *Tyus*, supra, 342 Conn. 814 (expert testimony about forensic "findings and conclusions was redundant to other evidence presented at trial"). But cf., e.g., *State* v. *Colton*, 227 Conn. 231, 254, 630 A.2d 577 (1993) (exclusion of evidence bearing on motivation of state's chief witness, *when no other evidence corroborated material aspects of witness' testimony*, was harmful error).

The defendant also had the opportunity to highlight any inconsistencies between G's trial testimony and her

the evidentiary rule for prior inconsistent statements, again noting the lack of foundation. Thus, the trial court ruled that the recordings of the forensic interviews would remain as exhibits for identification for both reasons. We similarly emphasize our disapproval of the trial court's imposition of its own basis for excluding the forensic interviews when the prosecutor did not contest their admission on that ground. Nevertheless, for the aforementioned reasons, we likewise conclude that any error was harmless beyond a reasonable doubt.

State *v.* Michael R.

statements in the first forensic interview during his cross-examination of G. This line of questioning repeatedly made the jury aware of the existence of the inconsistencies, notwithstanding the fact that the defendant subsequently changed topics on his own accord.[32] See *State* v. *Brown*, 187 Conn. 602, 613, 447 A.2d 734 (1982) ("It is relevant to the consideration of harmfulness that the jury [was] made aware of the possibility of [the accomplice's] personal interest in the outcome of the case through the cross-examination of her. Even more importantly, much of [the accomplice's] testimony was corroborated by the testimony of [other witnesses], and the arresting police officers."); see also *State* v. *Ayala*, 333 Conn. 225, 238–39 n.12, 215 A.3d 116 (2019) (jury was fully informed and not deprived of critical evidence regarding witnesses' credibility).

As to the second interview, G's answers during that interview also did not differ in any material way from her trial testimony. G's video recorded statements— when asked whether the defendant's hand had touched her vagina on the "inside . . . outside, or something else," that she "[did not] really know the word" for where the defendant had touched her and that the defendant's hand had touched the "middle-ish" of her vagina—are wholly consistent with her trial testimony that his "parts" went inside her vagina "[a] little bit."[33] Indeed, the trial court's refusal to admit the second video into evidence could not have harmed the defendant, as the statements therein corroborated G's testimony and squarely established the necessary element of "sexual intercourse" under the sexual assault charge; see General Statutes § 53a-70 (a) (2); by establishing

---

[32] The defendant specifically stated, "I'm going to move on."

[33] In addition to G's testimony that the defendant's "parts" went inside her vagina "[a] little bit," G testified that the defendant touched her vagina and breasts with his penis, mouth, and fingers, more than once, and that the defendant used different "private parts" of his every time he touched her "private parts . . . ."

State *v.* Michael R.

that "[p]enetration, *however slight*," occurred "to complete vaginal intercourse . . . or fellatio . . . . " (Emphasis added.) General Statutes § 53a-65 (2); see *State* v. *Albert*, 252 Conn. 795, 809, 750 A.2d 1037 (2000) ("digital penetration, however slight, of the labia majora is sufficient penetration to constitute vaginal intercourse under § 53a-65 (2)" (emphasis omitted)); see also, e.g., *State* v. *Albert*, supra, 797, 813–14 (there was sufficient evidence of sexual assault in first degree when defendant put his hand underneath three year old victim's bathing suit and touched inside her "crotch" with his finger (internal quotation marks omitted)); *State* v. *Gerald A.*, supra, 183 Conn. App. 93–94 ("[o]n the basis of [the victim's] testimony that she flinched when the defendant *tried* to put his finger inside of her vagina because it hurt, she clenched and it hurt, the *jury was free to draw the reasonable inference that the defendant at least digitally penetrated* [*the victim's*] *labia majora*" (emphasis added)). Thus, the admission of the recording of the second interview would have been damaging to the defendant's case.

To the extent that there were any inconsistencies between the recording of the second interview and G's trial testimony with respect to the type of penetration, the exclusion of the recording of the second interview was also harmless because the defendant did not focus his defense on whether the state had proven the element of penetration but, rather, mounted an attack on G's credibility as a complaining witness and attempted to cast this case squarely as one of "he said . . . she said." Given the defendant's focus on G's credibility, the exclusion of the otherwise inculpatory recording of the second interview did not harm the defendant because there was substantial evidence corroborating G's testimony. In addition to testimony from both the state's and the defendant's expert witnesses explaining the concept

State *v.* Michael R.

of delayed disclosure,[34] overwhelming evidence of the defendant's conduct with respect to the charge, such as directing G to send him posed, nude images, and the images themselves—including one of him shirtless in bed with her—further support the credibility of G's testimony with respect to the charge of sexual assault in the first degree. Indeed, the two shirtless photographs of the defendant in bed with G linked them to the location where G claimed the sexual abuse took place, and the nurse practitioner testified that she could not rule out sexual abuse as part of G's diagnosis. Therefore, we are convinced that the exclusion of both forensic interviews was harmless beyond a reasonable doubt.

IV

Lastly, we reject the defendant's claims that the evidence was insufficient to support his conviction of assault in the third degree, violation of a protective order, and stalking in the first degree. Before addressing the defendant's specific sufficiency claims, we observe that a party challenging the validity of a jury's verdict on the ground of insufficiency carries a difficult burden. See, e.g., *State* v. *Rhodes*, 335 Conn. 226, 233, 249 A.3d 683 (2020). "The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether [on] the facts so construed and the inferences reasonably drawn

---

[34] Williams testified regarding the barriers to disclosure of sexual abuse in delayed reporting cases and stated that, because G struggled through the entire first forensic interview, she considered her disclosure to be an incomplete one. Audrey Courtney, the nurse practitioner who examined G and who specializes in sex abuse cases, testified as an expert for the state as to the reasons why children often deny or delay disclosing sexual abuse, and the jury heard competing testimony in favor of the defendant on delayed and incomplete disclosure from Eiswirth.

State *v.* Michael R.

therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt.'' (Internal quotation marks omitted.) *State* v. *Brown*, 345 Conn. 354, 369, 285 A.3d 367 (2022). "On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [fact finder's] verdict of guilty.'' (Internal quotation marks omitted.) *State* v. *Fisher*, 342 Conn. 239, 249, 269 A.3d 104 (2022).

A

We begin with the defendant's claim that the evidence was insufficient to support his conviction of assault in the third degree. Specifically, the defendant argues that he lacked the intent to cause G to sustain the physical injury necessary to satisfy the elements of § 53a-61 (a) (1). The defendant contends that the jury could infer that a slight bruise was caused by the use of a belt, but, in light of his and G's testimony that a blanket was used to cover her during the beating so that it "wouldn't hurt,'' the state did not prove beyond a reasonable doubt that he had the requisite intent to injure G. In response, the state argues that the jury properly inferred the defendant's intent to inflict injury from, inter alia, his conduct of striking G nine times with a belt, his prior text messages announcing that he would "punish'' G, the physical characteristics of the bruise itself, and his own consciousness of guilt, as reflected in his misstatements and changes in statements to Newton regarding the incident.

We find no merit in the defendant's claim that the evidence was insufficient to support his conviction of assault in the third degree. Our review of the record reveals that the state presented more than sufficient evidence, including the defendant's statements, the size

State *v.* Michael R.

of the bruise, and the number of times that the defendant struck G, to support the jury's finding that the defendant intended the natural consequences of his actions. See, e.g., *State* v. *Lamantia*, 336 Conn. 747, 756–57, 765, 250 A.3d 648 (2020) (there was permissible inference that defendant intended had natural consequences of her voluntary act). Accordingly, we conclude that sufficient evidence supported the defendant's conviction of assault in the third degree.

B

We next turn to the defendant's claim that the evidence was insufficient to support his conviction of violation of a protective order and stalking in the first degree. The defendant claims that, because he was stationary when G saw him, he did not violate the protective order, as required by § 53a-223, and that, even if he did, the state failed to establish the "course of conduct" element of stalking in the first degree. General Statutes (Rev. to 2017) § 53a-181d (b) (1) and (2). The state, in turn, argues that the defendant's arguments are factual arguments that are more suited to a jury than an appellate court and that sufficient evidence supported the jury's verdict. The state further contends that the evidence showed that the defendant twice positioned himself on G's route to school at the time her school van would pass and made eye contact with her. We agree with the state.

The jury reasonably could have found the following additional facts, which are relevant to our review of this claim. On January 3, 2018, the defendant positioned himself on a bench located outside of a McDonald's restaurant one tenth of one mile away from the entrance to G's school, where G made eye contact with him from inside her school van as it passed by. Upon her arrival at school, G, visibly shaken, told her school counselor that the defendant had made eye contact with her and

State *v.* Michael R.

that she was afraid that he would come into the school and take her.

On January 18, 2018, the defendant parked his car in a nearby Feed Barn parking lot, pointing at an intersection on G's school van route, and stared at the road until the school van drove by. Jeannine Begley, a detective with the New Milford Police Department who was acting undercover, parked next to the defendant and took a photograph of the defendant sitting in his car facing the intersection. Once the van had passed through the intersection, Begley followed the defendant as he pulled out of the parking lot, "[without] delay," to follow the van to the school, where the children disembarked. Upon arriving at school, G, again visibly shaken, told another school counselor that she saw the defendant's car in the Feed Barn parking lot, across from the McDonald's restaurant, on her way to school that morning. The defendant was later apprehended.

1

We begin with the defendant's claim that the evidence was insufficient to convict him of two counts of criminal violation of a protective order. Specifically, the defendant argues that the jury could not have found beyond a reasonable doubt that, based on the evidence adduced at trial, he stalked G or followed G's school van on January 3 or 18, 2018.

"This court has held that proof of the criminal violation of a protective order pursuant to § 53a-223 merely requires the issuance of a protective order against the defendant pursuant to [General Statutes] § 46b-38c (e) . . . and the defendant's violation of that order." (Internal quotation marks omitted.) *State* v. *Fagan*, 280 Conn. 69, 76, 905 A.2d 1101 (2006), cert. denied, 549 U.S 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007). "[T]he intent required to prove a violation of § 53a-223 (a) is only that the defendant intended to perform the activities

State *v.* Michael R.

that constituted the violation of the protective order.''
Id., 77. Therefore, in order to convict the defendant of
two counts of violating § 53a-223 (a), the state was
required to prove that the defendant either followed or
stalked G on January 3 and 18, 2018, and that the acts
resulted from intentional conduct rather than accident
or mistake. See id., 77–78.

The jury reasonably could have inferred from the
evidence presented at trial that, on January 3, 2018, the
defendant knew that G would be in the van heading to
school, watched her van's route specifically to see her,
and cleared a spot to allow himself to wait on the bench
until he did. At trial, Detective Robert Guilbeault of
the New Milford Police Department testified that fresh
snow from the night before had been cleared off the
bench, with fresh footprints directed toward the inter-
section. Further, the jury could have inferred that, on
January 18, 2018, the defendant followed G to school
upon seeing the van drive by because he parked in a
nearby parking lot on the van's route, waited for the
van to pass, and immediately pulled out when it did.
Although the defendant claimed at trial that he was
unaware that G attended school there, and to the offi-
cers that afternoon that he was looking for his own
children when he followed the van, the jury was not
required to believe him, and the state presented evi-
dence that, during the controlled phone call between
R and the defendant, R told the defendant that G was
attending the same school as before she was removed
from R's care. Therefore, the evidence presented at trial
justifies the inference that, on January 3 and 18, 2018,
the defendant had the requisite intent to stalk and to
follow G.[35] Accordingly, we conclude that the state pre-

---

[35] "[The term] *following* implies proximity in space as well as time. Whether
someone has deliberately maintained sufficient visual or physical proximity
with another person, uninterrupted, over a substantial enough period of
time to constitute following will depend [on] a variety of differing factors
in each case. These are appropriate issues for the trier of fact to decide
. . . .'' (Emphasis added; internal quotation marks omitted.) *State* v. *Jack-*

State *v.* Michael R.

sented sufficient evidence to sustain both convictions of criminal violation of a protective order.

2

Finally, we turn to the defendant's claim that the evidence was insufficient to convict him of two counts of stalking in the first degree. The defendant argues that the evidence is insufficient to convict him because "course of conduct" requires "two or more acts," and the evidence was insufficient to convict him on the January 3, 2018 charge because there was no evidence that he violated the protective order on that day. We disagree and affirm the conviction of stalking in the first degree.

To convict the defendant of two counts of stalking in the first degree, as those counts were charged in the present case, the state had to prove that the defendant committed one count of stalking in the first degree in violation of § 53a-181c (a) (2) and one count of stalking in the first degree in violation of § 53a-181c (a) (3). To convict the defendant of one count of stalking in the first degree in violation of § 53a-181c (a) (2), the state was required to prove beyond a reasonable doubt that the defendant committed stalking in the second degree, as provided in General Statutes (Rev. to 2017) § 53a-181d, and that such conduct violated a court order in effect at the time of the offense. See General Statutes (Rev. to 2017) § 53a-181c (a) (2). To convict the defendant of one count of stalking in the first degree in violation of § 53a-181c (a) (3), the state was required to prove beyond a reasonable doubt that the defendant committed stalking in the second degree and that G was under sixteen years old at the time of the offense. See General Statutes (Rev. to 2017) § 53a-181c (a) (3).

*son*, 56 Conn. App. 264, 272–73, 742 A.2d 812, cert. denied, 252 Conn. 938, 747 A.2d 4 (2000).

State *v.* Michael R.

To satisfy the stalking in the second degree element of each charge, the state was required to prove beyond a reasonable doubt that the defendant knowingly engaged in a "course of conduct" directed at a specific person that would reasonably cause fear or emotional distress. General Statutes (Rev. to 2017) § 53a-181d (b) (1) and (2). " '[C]ourse of conduct' means *two or more acts*, including, but not limited to, acts in which a person . . . follows, lies in wait for, monitors, observes, surveils, threatens, harasses, communicates with or sends unwanted gifts to, a person . . . ." (Emphasis added.) General Statutes (Rev. to 2017) § 53a-181d (a) (1). Therefore, for the state to satisfy the stalking in the second degree element of § 53a-181c (a) as to each charge, the jury must have found, beyond a reasonable doubt, that, on more than one occasion with respect to each charge, the defendant followed or stalked G. See, e.g., *State* v. *Jackson*, 56 Conn. App. 264, 277, 742 A.2d 812 (defendant acted on more than one occasion), cert. denied, 252 Conn. 938, 747 A.2d 4 (2000).

Construing the evidence presented at trial in the light most favorable to sustaining the verdict; e.g., *State* v. *Harris*, 227 Conn. 751, 757, 631 A.2d 309 (1993); the jury reasonably could have inferred that, on January 3, 2018, the defendant knowingly lay in wait for, monitored, surveilled, or observed G, constituting one "act" for purposes of § 53a-181 (a) (1). The jury also reasonably could have inferred that, on January 18, 2018, the defendant knowingly followed, lay in wait for, monitored, surveilled, or observed G, constituting the second "act" for purposes of § 53a-181 (a) (1). See footnote 35 of this opinion. Accordingly, we conclude that the state established the requisite "course of conduct" necessary to satisfy the element of stalking in the second degree by presenting sufficient evidence of the defendant's conduct and other circumstantial evidence from which the jury reasonably could have inferred that the defen-

State *v.* Michael R.

dant committed two acts with the intent to follow, lie in wait for, monitor, surveil, or observe G. See, e.g., *State* v. *Arthurs*, 121 Conn. App. 520, 521, 526, 997 A.2d 568 (2010) (upholding first degree stalking conviction when defendant followed or lay in wait for victim at triathlon and church in two different towns on same day), cert. denied, 310 Conn. 957, 82 A.3d 626 (2013); *State* v. *Cummings*, 46 Conn. App. 661, 664–67, 680–81, 701 A.2d 663 (upholding first and second degree stalking conviction when defendant followed, lay in wait for, and violated protective order benefiting victim multiple times over course of several months), cert. denied, 243 Conn. 940, 702 A.2d 645 (1997).

With respect to the additional factors required for each conviction under § 53a-181c (2) and (3), it is undisputed that the civil protective order was in effect, of which the defendant was aware, at the time of the stalking. It is further undisputed that G was under sixteen years old when the stalking took place. Accordingly, we conclude that the state presented sufficient evidence from which the jury could have reasonably found that the defendant violated § 53a-181c (a) (2) and (3).

The judgments are affirmed.

In this opinion the other justices concurred.